# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD LUNA,<br><br>       Plaintiff,<br><br>    v.<br><br>DR. MOON, et al.,<br><br>       Defendants. | Case No.  1:16-cv-00313-NONE-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(ECF Nos. 79-84, 88-89, 90-92)<br><br>OBJECTIONS DUE WITHIN THIRTY DAYS |

Edward Luna ("Plaintiff"), a state prisoner, is appearing *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.  Currently before the Court is Wayne Ulit, M.D., Jong Moon, M.D. and Jeffrey Wang, M.D. ("Defendants") motion for summary judgment.

## I.

## PROCEDURAL HISTORY

Plaintiff filed this action on March 7, 2016.  (ECF No. 1.)  On May 27, 2016, Plaintiff's complaint was found not to state a cognizable claim and Plaintiff was granted leave to file an amended complaint.  (ECF No. 7.)

Plaintiff filed a first amended complaint on June 17, 2016.  (ECF No. 8.)  On March 31, 2017, Plaintiff's first amended complaint was found not to state a cognizable claim and he was granted leave to file a second amended complaint.  (ECF No. 9.)

After receiving two extensions of time, Plaintiff filed a second amended complaint ("SAC") on July 28, 2017.  (ECF No. 15.)  On November 2, 2017, Plaintiff's second amended complaint was found to state a claim against Defendants Ulit, Moon, and Wang for deliberate indifference to serious medical needs in violation of the Eighth Amendment.  (ECF No. 16.)  Defendants filed an answer to the complaint on March 29, 2018.  (ECF No. 31.)

On August 1, 2018, Defendants filed a motion for summary judgment due to Plaintiff's failure to exhaust his administrative remedies.  (ECF Nos. 43-46.)  Plaintiff filed an opposition on August 31, 2018.  (ECF Nos. 48-49.)  Defendants filed a reply and objections to Plaintiff's opposition on September 7, 2018.  (ECF Nos. 51-52.)  On October 16, 2018, an order was issued granting Defendants' request to vacate the scheduling order pending resolution of the motion for summary judgment.   (ECF Nos. 53-55, 56.)   On January 10, 2019, findings and recommendations issued recommending granting in part and denying in part Defendants' motion for summary judgment.   (ECF No 58.)   Plaintiff filed objections to the findings and recommendations on February 4, 2019.  (ECF No. 59.)

On February 12, 2019, Chief Judge Lawrence J. O'Neill adopted the findings and recommendations.  (ECF No. 60.)  This action is now proceeding on Plaintiff's SAC against Defendants Ulit, Moon, and Wang for deliberate indifference to serious medical needs in violation of the Eight Amendment for Plaintiff's claims regarding denial of pain medication and failure refer him for treatment for his right arm, wrist, and shoulder pain beginning in February 2013.  (Id. at 2.[1])

On November 25, 2019, Defendants filed the instant motion for summary judgment.[2]  (ECF Nos. 79-84.)  After receiving an extension of time, Plaintiff filed an opposition on January 21, 2020.  (ECF Nos. 88-89.)  Defendants filed a reply on January 28, 2020.  (ECF Nos. 90-92.)  The matter is submitted for decision pursuant to Local Rule 230(l).

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by Defendants in the motion for summary judgment (see ECF No. 82).  Woods v. Carey, 684 F.3d 934, 939 (9th Cir. 2012); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

## II.

### MOTION FOR SUMMARY JUDGMENT LEGAL STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case...."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 322.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine

1   issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v.</u>

2   <u>City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation

3   omitted).

### III.

### SUMMARY OF SECOND AMENDED COMPLAINT ALLEGATIONS[3]

6   Plaintiff began experiencing worsening pain in his cervical spine that was radiating to his

7   shoulders and arms, causing tingling with a pins and needles sensation and numbness to his face,

8   arms, and digits. (SAC ¶ 1.) In 2010, Plaintiff sought medical attention as the motor function in

9   his hands, neck, arms and feet began to fail due to his increasing pain level and no effective pain

10  medication. (SAC ¶ 2.) On January 20, 2011, Plaintiff had an MRI of his cervical spine that

11  showed he had severe injury with spinal cord compression at C4-C5 and C6-C7 with narrowing

12  of the spinal cord at C6-C7. (SAC ¶ 3.) Plaintiff had an EMG nerve conduction study on June

13  10, 2010 which concluded that he had severe left carpal tunnel syndrome ("CTS") with

14  decreased sensation in median nerve distribution. (SAC ¶ 4.)

15  On January 11, 2012, Plaintiff had a left carpal tunnel release. (SAC ¶ 5.) Dr. Smith, a

16  neurosurgeon, told Plaintiff if left untreated for several months, permanent irreversible damage

17  to the digits would occur. (<u>Id.</u>) Plaintiff required pain medication and Defendant Ulit told

18  Plaintiff to deal with it that he would not prescribe medication for pain. (SAC ¶ 6.) Plaintiff

19  continued to be in pain from his left carpal tunnel surgery, his right hand and wrist injury,

20  cervical spine, lumbar spine, and foot pain. (SAC ¶ 7.)

21  On May 28, 2012, Defendant Ulit examined Plaintiff and Plaintiff requested pain

22  medication. (SAC ¶ 8.) Defendant Ulit refused to provide Plaintiff with pain medication and

23  Plaintiff was only receiving ibuprofen which was ineffective for the pain Plaintiff was

24  experiencing in his cervical spine and his right and left hands and wrist. (<u>Id.</u>) Defendant Ulit

25  refused to prescribe pain medication for the remainder of 2012. (SAC ¶ 9.) On December 7,

---

[3] Neither Plaintiff's opposition to the motion for summary judgment nor his response to Defendants' statement of undisputed facts were signed under penalty of perjury. Therefore, the Court considers Plaintiff's verified second amended complaint in opposition to Defendants' motion for summary judgment. <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 (9th Cir. 1995); <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197 (9th Cir. 1987).

2012, Defendant Ulit examined Plaintiff and stated that he would not be prescribing any pain medication and that there was nothing wrong with Plaintiff.  (Id.)  Defendant Ulit did not have Plaintiff's MRI results.  (Id.)

Over the next two months Plaintiff complained of worsening pain in the right hand as wrists and was unable to write and he required assistance getting dressed due to the unbearable pain in his right hand, neck and back.  (SAC ¶ 10.)

Defendant Ulit examined Plaintiff on February 15, 2013 for pain in his right and left hand and wrist and his cervical spine.  (SAC ¶ 11.)  Defendant Ulit refused to provide Plaintiff with any pain medication other than ibuprofen.  (Id.)

Defendant Ulit examined Plaintiff on March 13, 2013.  (SAC ¶ 13.)  Plaintiff was in extreme pain and requested more effective pain medication as the ibuprofen only relieved about five percent of his pain, and left him incapacitated at times and unable to perform every day functions.  (Id.)  Defendant Ulit informed Plaintiff that a request for services ("RFS") had been denied and that Plaintiff would not be receiving any additional pain medication.  (Id.)

On March 20, 2013, Plaintiff was in so much pain from his right and left carpal tunnel and his lumbar spine that he was suffering from sleep deprivation because the pain would wake him with the slightest movement.  (SAC ¶ 14.)  Plaintiff submitted healthcare services forms over the next six months and he continued to be denied pain medication.  (SAC ¶ 15.)  His back pain and right carpal tunnel continued to worsen.  (SAC ¶ 16.)  Defendant Ulit suspected that his wrist pain was due to right CTS and he ordered a wrist splint and a nerve conduction study as well as ibuprofen which was not effective.  (Id.)

On September 9, 2013, Plaintiff was examined by Defendant Moon who gave Plaintiff his nerve conduction study results which showed CTS and a cervical spine injury.  (SAC ¶ 17.)  Defendant Moon refused to provide Plaintiff with stronger pain medication as the current medication were ineffective in relieving Plaintiff's extreme pain.  (Id.)  Plaintiff told Defendant Moon that the pain was so debilitating that he was at times unable to write, get dressed, get out of bed or properly bath himself.  (Id.)

Plaintiff filed an inmate appeal no. CORHC-13053752 due to the extreme pain that he

1   was experiencing.  (SAC ¶ 18.)

2      On December 10, 2013, Defendant Moon told Plaintiff the he had again been denied the

3   request for services to see an orthopedic surgeon.  (SAC ¶ 19.)  Plaintiff was denied pain

4   medication to relieve more than five percent of the pain he was experiencing but was kept on

5   ibuprofen that was ineffective to relieve his pain.  (Id.)

6      On January 31, 2014, Plaintiff was seen by Dr. Smith who confirmed that Plaintiff had

7   moderate to severe CTS of his right hand and wrist.  (SAC ¶ 20.)  Dr. Smith told him that

8   surgical intervention was emergent to prevent irreversible deformation of Plaintiff's right digits

9   and if not done within sixty days permanent injury would likely occur.  (Id.)

10     Plaintiff's condition continued to deteriorate with worsening pain to his lumbar spine and

11  spasms in both leg.  (SAC ¶ 21.)  Plaintiff was seen by Defendant Moon who refused Plaintiff's

12  request for stronger pain medication.  (Id.)  Plaintiff was left to suffer in extreme pain and

13  discomfort for the next eight weeks.  (SAC ¶ 22.)  He filed a healthcare services request to be

14  seen by a physician but was denied.  (Id.)

15     On October 21, 2014, Defendant Moon submitted another request for services for right

16  CTS surgery and Plaintiff received surgery.  (SAC ¶¶ 22, 23.)  Plaintiff continued to suffer from

17  pain to his spine that only worsened.  (SAC ¶ 24.)

18     Plaintiff filed an inmate appeal on November 20, 2014, after his body began to swell after

19  surgery and he was in immense pain.  (SAC ¶ 24.)  On December 4, 2014, Plaintiff sent a request

20  for interview form to Defendant Wong, but Defendant Wong ignored his request.  (SAC ¶ 25.)

21     From January 1, 2015 through December 2015, Plaintiff continually submitted healthcare

22  request forms due to his immense pain and he was denied pain medication.  (SAC ¶ 26.)

23     From January 1, 2016 through December 2016, Plaintiff continued to suffer from pain in

24  his cervical spine that caused numbness to both his arms, a burning sensation down the right

25  side, leg spasms, and limited range of motion in his spine but was still only prescribed ibuprofen

26  by Defendants Moon, Ulit, and Wang.  (SAC ¶ 28.)  Plaintiff had an MRI of his cervical spine on

27  April 4, 2016 that showed mild cord compression at C4-C5 and C6-C7 and narrowing of the

28  spinal cord at C6-C7.  (SAC ¶ 29.)  Defendant Wang denied Plaintiff's request to be seen by a

neurologist.  (SAC ¶ 30.)  Defendant Wang denied a second request to be seen by a neurologist on June 18, 2016.  (SAC ¶ 31.)  In August 2016, Plaintiff had a nerve conduction study that showed further progression of his cervical spine injury.  (SAC ¶ 32.)

## IV.

## MATERIAL UNDISPUTED FACTS[4]

1.     Plaintiff is a state prisoner is the custody of the California Department of Corrections and Rehabilitation ("CDCR").  (SAC at 1.)

2.     At all times relevant to this lawsuit, Plaintiff was incarcerated at California State Prison-Corcoran (CSP-COR).  (SAC at 7-12.)

3.     Defendant Ulit was a physician and surgeon at CSP-COR from September 2007 to December 2015 and was Plaintiff's primary care provider ("PCP") from May 2012 through July 2013.  (Decl. of Wayne Ulit in Supp. of Defs.' Mot. for S.J. ("Ulit Decl.") ¶¶ 4, 5.)

4.     Defendant Moon was a physician and surgeon at CSP-COR from April 2007 through April 2015 and was Plaintiff's PCP from September 2013 through February 2015. (Decl. of Jong Moon in Supp. of Defs.' S.J. ("Moon Decl.") ¶¶ 4, 5.)

5.     Defendant Wang was chief medical officer at CSP-COR from January 31, 2013 to January 30, 2015 and did not provide direct patient care to inmates at CSP-COR during this time. (Decl. of Jeffrey Wang in Supp. of Defs.' Mot. S.J. ("Wang Decl.") ¶¶ 4, 6.)

6.     Defendant Wang was a physician and surgeon at CSP-COR from January 31, 2015 to December 31, 2015 and was Plaintiff's PCP from approximately May 2015 through December 2015.  (Id. ¶ 4, 21.)

7.     At CSP-COR there is a tracking system for certain medications for the purposes of monitoring the patient's use.  (Ulit Decl. ¶ 35.)

8.     For these certain types of medication, the inmate/patient is required to go to the designated location, receive the medication, and a health care service employee signs off on the record.  (Id.)

---

[4] Hereafter referred to as "U.F."

9.      Gabapentin is a non-formulary medication that must be specifically requested by the PCP and is also tracked for patient use.  (Id. ¶¶ 33, 35.)

10.     In treating his right arm, wrist, and shoulder pain, on diagnosis of neuropathy, Plaintiff was prescribed gabapentin 600 mg to be taken twice a day.[5]   (Id. ¶ 33, Medication Reconciliation, ECF No. 84-11 at 76, 78, 90; Medication Reconciliation, ECF 84-12 at 115, 188, 191; Nonformulary Drug Request, ECF No. 84-11 at 77; Nonformulary Drug Request, ECF No. 84-12 at 118.)

11.     Defendants Ulit and Moon, as Plaintiff's PCP, monitored his use of gabapentin as indication of pain level.  (Ulit Decl. ¶ 36; Moon Decl. ¶ 60.)

12.     Plaintiffs medical records reflect that despite the fact he was initially prescribed two tablets of gabapentin by mouth twice a day for neuropathy, Plaintiff did not take the medication as prescribed.  (Ulit Decl. ¶ 36, Moon Decl. ¶¶ 47, 60.)

13.     As reflected in Plaintiff's Medical Reconciliation record, for majority of days, Plaintiff took the medication only once and on numerous days, Plaintiff failed to take his medication at all.[6]  (Medication Administration Record, ECF No. 84-11 at 56, 57, 63, 71, 81, 87, 88, 89, 96, 97, 103, 107, 114; Medication Administration Record, ECF No. 84-12 at 110, 112, 119, 120, 126, 137, 139, 144, 153, 156, 166, 169, 173, 181, 186, 193, 198, 205, 210, 211, 215.)

14.     Under California state prison's health care receivership, there are Utilization Management ("UM") policies and procedures that were developed to ensure the appropriate use of the limited health care resources in California's state prisons.[7]  (Wang Decl. ¶ 7.)

15.     UM policies and procedures include, but are not limited to, medical procedures,

---

[5] Plaintiff disputes numerous facts on the ground that Defendants failed to follow a proper treatment plan and that he reported that the failure of the medications to effectively treat his condition.  However, Plaintiff's disagreement with the treatment plan or medication's effectiveness is not a dispute as to the facts stated.  Plaintiff cannot create a disputed of fact by merely challenging the credibility of the defendants' facts without citing to any contradictory evidence.  Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983).  Nor is a fact disputed because Plaintiff disagrees with it.  Plaintiff must point to specific evidence that creates a dispute of fact.  The Court will only address those issues raised by Plaintiff that contain actual disputes as to the fact set forth.

[6] Plaintiff objects on the ground that the fact is argumentative.  Plaintiff's objection on this ground is overruled.

[7] Plaintiff disputes that Defendants relied on the policies which they admit are limited.  To the extent that Plaintiff challenges the limited resources available to treat prisoner's in California it does not create a dispute of the fact that Defendants' relied on the policies in treating Plaintiff.

consultation with specialists, and diagnostic studies, to promote the best possible patient outcomes, eliminate unnecessary costs, and maintain consistency in the delivery of health care services in California's state prisons.  (Id.)

16.     Only those medical procedures, specialist consultations, diagnostic studies, etc. that are considered medically necessary under the UM are provided to the inmate/patient.  (Id.)

17.     "Medically necessary" as defined under the UM, means medical services the PCP determines are needed to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data or clinical evidence as being an effective health care service for the purpose intended, or in the absence of available health outcome data, are judged to be necessary and are supported by diagnostic information or specialty consultation. (Id.)

18.     Evidence-based medical necessity criteria has been implemented statewide in California state prisons, and the InterQual criteria have been adopted as the guidelines for PCPs to determine medical necessity.  (Id.)

19.     At CSP-COR, when an inmate requires medical treatment, they fill out a Health Care Services form and put it in the designated box.  (Ulit Decl. ¶ 6; Moon Decl. ¶ 6.)

20.     A registered nurse ("RN") reviews the form within one business day and if he/she determines the request requires an assessment from the PCP, the RN refers to the PCP within three time frames, the selection of which depends on the RN's determination of whether the issue is emergent (same-day), urgent (24 hours), or routine (14 days).  (Id.)

21.     The PCP is responsible for attending to the inmate/patients on his/her schedule for the day.  (Id.)

22.     During an appointment with an inmate/patient, the PCP listens to his/her subjective complaints, performs a physical examination, reviews relevant medical history, and then renders an assessment and plan.  (Id.)

23.     The PCP will determine whether further tests or treatment is medically necessary. (Id.)

24.     A Request for Services ("RFS") is a form that is used by PCPs to request

specialty medical services for a patient/inmate that are not available at the prison.  (Ulit Decl. ¶ 7.)

25.     The requesting physician prepares the RFS and submits it to the chief medical examiner, chief medical officer, or designee such as the chief physician and surgeon at the prison for review.  (Ulit Decl. ¶ 7; Moon Decl. ¶ 7.)

26.     Information submitted in the RFS by the requesting physician must meet InterQual criteria for medical necessity to get approved.  (Wang Decl. ¶ 9.)

27.     Clinical findings include the reported, observed and verified symptoms of the patient/inmate by the treating medical staff.  (Id.)

28.     The reviewing physician applies the clinical findings to the InterQual criteria in order to determine whether the requested service is medically necessary.[8]  (Id.)

29.     InterQual criteria is objective and used in both private and community medical settings to evaluate and determine the need for diagnostic treatment and testing.  (Id. ¶ 10.)

30.     According to the InterQual criteria, an EMG and/or MRI are not given as a matter of routine diagnosis for arm, wrist or shoulder pain, but are approved only for suspected nerve compression when the patient's pain has continued to worsen after clinical treatment with medication, reduced activities, and the regular use of an arm/wrist brace, to alleviate the pain.  (Id.)

31.     Defendant Wang did not approve or deny any of the RFS at issue in this litigation.[9]  (Id. ¶ 20.)

32.     Carpal tunnel syndrome (CTS) is the compression of the median nerve as it passes into the hand.  Swelling inside the wrist causes the compression in CTS and can lead to numbness, weakness and tingling near the thumb.  (Ulit Decl. ¶ 10; Moon Decl. ¶ 10; Wang Decl. ¶ 12.)

---

[8] Plaintiff contends that the facts regarding the InterQual criteria are disputed because there was objective evidence and a treatment plan that was ignored and he was not treated in a timely manner.  Whether there was medical evidence to support providing additional testing goes to the merits of the action, but does not create a dispute of the facts stated.

[9] Plaintiff argues that Defendant Wang was directly responsible for discussion and decisions that were made for patients by his subordinate staff members.  This issue shall be addressed in discussing supervisory liability.

33.     The protocol for treating CTS begins with administering anti-inflammatory medication as the majority of CTS is caused by overuse of the hand or hypothyroid and both issues can cause compression of the median nerve.  Anti-inflammatory medication relieves the swelling which in turn, reduces compression to the nerve.  (Ulit Decl. ¶¶ 10, 11; Moon Decl. ¶¶ 10; Wang Decl. ¶¶ 12, 13.)

34.     Clinical management of CTS also includes the use of a brace or split which assists in decompression.  The brace is typically worn at night.  (Ulit Decl. ¶ 10; Moon Decl. ¶ 10; Wang Decl. ¶ 12.)

35.     A patient with CTS is also told to avoid activities that worsen symptoms.  (Id.)

36.     CTS is considered a chronic pain condition and is typically treated with Motrin or acetaminophen.  (Ulit Decl. ¶ 11; Moon Decl. ¶ 11; Wang Decl. ¶ 13.)

37.     Gabapentin is also commonly prescribed for CTS pain because it designed to treat nerve pain and acts by numbing the nerve.  (Id.)

38.     In treating CTS, surgery is seen as a last resort.  (Id.)

39.     Cervical spine stenosis is a common cause of neck pain and caused by narrowing of the spinal canal which puts pressure on the spinal cord.  (Ulit Decl. ¶ 12; Moon Decl. ¶ 12; Wang Decl. ¶ 14.)

40.     Most cases of cervical spine stenosis are successfully treated with pain medication and anti-inflammatory medication, and temporary rest from aggravating activities.  (Id.)

41.     Degenerative disc disease is when normal changes that occur in the disks of the spine cause pain and in some cases, numbness and tingling in the arms and legs.  (Ulit Decl. ¶ 13; Moon Decl. ¶ 13; Wang Decl. ¶ 15.)

42.     Following diagnosis, degenerative disk disease is treated with anti-inflammatories to ease the pain and reduce swelling.  (Id.)

43.     Pain from chronic conditions such as CTS and other conditions affecting the nerves in the upper extremities are properly treated with ibuprofen, Tylenol, and gabapentin. (Ulit Decl. ¶ 14; Moon Decl. ¶ 14; Wang Decl. ¶ 16.)

44.     Ibuprofen, Tylenol, and gabapentin are also part of a generally recognized

treatment plan for CTS.  (Ulit Decl. ¶ 14; Moon Decl. ¶ 14.)

45.   Narcotic medications are not appropriate for treating chronic pain as they are highly addictive.  (Ulit Decl. ¶ 14; Moon Decl. ¶ 14; Wang Decl. ¶ 16.)

46.   Narcotic pain medication may be prescribed to the patient following surgery at a maximum of 14 days.  (Ulit Decl. ¶ 15; Moon Decl. ¶ 15; Wang Decl. ¶ 17.)

47.   Prescribing pain medication is the sole responsibility of the patient/inmate's PCP. (Wang Decl. ¶ 16.)

48.   The chief medical officer does not have authority to compel a physician to prescribe narcotic pain medication.[10]  (Id.)

49.   Defendants Ulit and Moon who have both treated many patients with CTS in private practice and as physicians with CDCR, have never prescribed narcotics to treat pain associated with CTS, cervical spine stenosis, or degenerative disk disease.  (Ulit Decl. ¶ 14; Moon Decl. ¶ 14.)

50.   Plaintiff is not a doctor and is not aware of the general protocol for treating pain resulting from CTS or of the treatment of carpal tunnel syndrome.[11]  (Depo. Edward Luna ("Pl. Depo.") 6:9, 47:18-19:2, 51:11-52:24, ECF No. 84-10 at 176-193.)

51.   On February 15, 2013, Plaintiff was seen by Defendant Ulit on complaints of pain in his right arm that radiated down to his elbow with no noted weakness.  (Ulit Decl. ¶ 16; 2/15/13 Chronic Care Progress Note ("CCPN"), ECF No. 84-11 at 16.)

52.   On February 15, 2013, Defendant Ulit assessed that Plaintiff's left arm strength was weaker than the right, there was no atrophy of the muscle arm and forearm on the right side. (Id.)

53.   On February 15, 2013, Defendant Ulit assessed that a consult with neurology could assist with determining the cause of Plaintiff's pain and that ibuprofen and gabapentin

---

[10] Plaintiff objects that Defendants have entered no evidence in support of this fact.  However, Dr. Wang's declaration is such evidence.  Plaintiff's objection that the statement lacks support and is vague and ambiguous is overruled.

[11] Plaintiff objects on the grounds that the statement is argumentative and lacks foundation as Defendants are not aware of what informational resources are available to Plaintiff.  However, Plaintiff is not a physician and is not qualified to opine on the issue.  Plaintiff's objection is overruled.

were the proper method of treating Plaintiff's pain in light of his symptoms.  (Ulit Decl. ¶ 16.)

54.   On February 15, 2013, Defendant Ulit submitted a physician's order and RFS requesting a neurology consult.  (Ulit Decl. ¶ 17; 2/15/13 Physician's Orders, ECF No. 84-11 at 20.)

55.   On February 28, 2013, Plaintiff was seen by Defendant Ulit for a new chrono and for persistent neck pain on his right side.  (Ulit Decl. ¶ 18; 2/28/13 Medical Progress Note ("MPN"), ECF No. 84-11 at 22.)

56.   On February 28, 2013, Defendant Ulit explained to Plaintiff that he had already submitted the RFS for a neurology consult.  (Ulit Decl. ¶ 18.)

57.   On February 28, 2013, Defendant Ulit assessed that Plaintiff's right arm grip was slightly weaker than the left and there was no atrophy of the muscles and sensory was intact, and determined the best course of action was to wait for the results of the RFS and to continue to treat Plaintiff's pain with ibuprofen and gabapentin.  (Ulit Decl. ¶ 18; 2/28/13 MPN, ECF No. 84-11 at 22.)

58.   On March 13, 2013, Plaintiff was seen by Defendant Ulit and was informed that the RFS for neurology consult had been denied.  (Ulit Decl. ¶ 19; 3/13/13 MPN, ECF No. 84-11 at 26; 3/17/13 PRS, ECF No. 84-11 at 24.)

59.   On March 13, 2013, Defendant Ulit performed a neurological examination and assessed Plaintiff's right arm grip was slightly weaker than the left, there was no atrophy of the muscles, and the plan was to continue current pain medications and clinical management and to possibly discuss the denied RFS with Utilization Management (UM).  (Ulit Decl. ¶ 19; 3/13/13 MPN, ECF No. 84-11 at 26.)

60.   As a person designated to approve or deny requests for diagnostic services, Dr. Beregovskaya was responsible for approving or denying requests for neurology consultation at CSP-COR on February 21, 2013.[12]  (Wang Decl. ¶ 20.)

---

[12] Plaintiff does not dispute that Dr. Beregovskaya denied the RFS, but contends that Defendant Wang was responsible because as chief medical officer he was to be consulted for approval in his administrative duty. However, Plaintiff has presented no evidence that Dr. Beregovskaya was required to consult Defendant Wang in making the decision to deny the RFS.

61.     Dr. Beregovskaya denied the February 15, 2013 RFS and ordered clinical management.  (Id.)

62.     The RFS was denied because at the time it was submitted, there was no medical evidence indicating surgical treatment for Plaintiff's neck conditions could reduce his pain or avoid disability affecting his major activities of daily living.  (Id. ¶ 19.)

63.     Although Plaintiff alleges that he was seen on March 20, 2013, there is no record of a March 20, 2013 medical appointment with Defendant Ulit in Plaintiff's medical file.[13]

64.     On April 9, 2013, Plaintiff came to his appointment with Defendant Ulit with his Inmate Appeal Form, and requested an MRI scan and referral to a neurologist.  (Ulit Decl. ¶ 20; 4/9/13 MPN, 84-11 at 29.)

65.     On April 9, 2013, Defendant Ulit explained to Plaintiff that since a 2011 MRI already showed disk disease, there was no need to redo the test.  (Id.)

66.     On April 9, 2013, Defendant Ulit reminded Plaintiff that an RFS for neurology had been denied with direction to continue with clinical management.  (Id.)

67.     On April 9, 2013, Defendant Ulit assessed that clinical management would continue and that Plaintiff should avoid traumatic activity.  Plaintiff confirmed he understood Defendant Ulit's assessment and plan and stated he had no further questions.  (Id.)

68.     Pain associated with Plaintiff's disk disease was properly treated with Ibuprofen, acetaminophen, and gabapentin.  (Ulit Decl. ¶¶ 13, 14.)

69.     On April 23, 2013, Plaintiff was seen by Dr. Edgar Clark instead of Defendant Ulit for scheduling reasons.  (Ulit Decl. ¶ 21; 4/23/13 MPN, ECF No. 84-11 at 32.)

70.     On April 23, 2013, Plaintiff presented with complaints of pain in his upper right extremity and said that he had experienced pain since 2008 when he hit his head falling at the Delano prison.  (Id.)

71.     On April 23, 2013, Dr. Clark assessed a negative Spurling, negative Hoffman, positive Phalen and positive Tinel, as well as excellent shoulder range of motion, some clicking

---

[13] Plaintiff stipulates that there is no record of a March 20, 2013 medical appointment.

in the wrists and somewhat decreased sensation over the thumb anteriorly.  (Id.)

72.    Spurling test is used to assess nerve root pain and helps to diagnose cervical radiculopathy.  Phalen test is used to check for nerve problems and commonly used to diagnose carpal tunnel syndrome.  Tinel's sign is a way to detect irritated nerves and is commonly used to diagnose CTS.  Hoffman sign is a test to examine the reflexes of the upper extremities and is a quick, equipment-free way to test for the possible existence of spinal cord compression.  (Ulit Decl. ¶¶ 22, 24.)

73.    On April 23, 2013, Dr. Clark assessed that Plaintiff's pain was most consistent with right CTS and noted that while he had written out an RFS, the InterQual criteria for carpal tunnel release surgery included whether the patient had thyroid disease.  Dr. Clark reviewed Plaintiff's medical history and found that Plaintiff was taking thyroid medication so referral was not possible.  (Ulit Decl. ¶ 25; 4/23/13 MPN, ECF No. 84-11 at 32.)

74.    On July 12, 2013, Defendant Ulit was notified that Plaintiff had been referred to see him after failing to take his gabapentin prescribed for nerve pain, for either 3 consecutive days or had missed 50% of doses over a 7-day period.   (Ulit Decl. ¶ 26; Medication No Show/Refusal Referral, ECF No. 84-11 at 35.)

75.    On July 16, 2013, Defendant Ulit met with Plaintiff regarding the notification of missed medication and Plaintiff requested that Defendant Ulit change his prescription to as needed only.  Plaintiff complained of pain, tingling and numbness of the 3rd and 5th fingers and stated he believed the issue was carpal tunnel because he had left CTS surgery prior.  (Ulit Decl. ¶ 27; 7/16/13 MPN, ECF No. 84-11 at 37.)

76.    Plaintiff had carpal tunnel surgery on his left hand prior to his right hand.  (Pl. Depo. 73:18-74:6.)

77.    On July 16, 2013, Defendant Ulit performed a Tinel's sign test to assess the root of Plaintiff's pain and Plaintiff's result was a negative finding, assessed that there could still be a nerve problem and ordered a wrist splint to assist with nerve decompression and continued Motrin and gabapentin on an as needed basis per Plaintiff's request.  (Ulit Decl. ¶¶ 27, 28; 7/16/13 MPN, ECF No. 84-11 at 37; 7/16/13 Physician's Orders, ECF No. 84-11 at 41.)

78.   Plaintiff did not wear the wrist splint as he was directed by Defendant Ulit.  (Pl. Depo. 61:2-62:14.)

79.   On July 23, 2013, Defendant Ulit examined Plaintiff on complaints of pain in the right wrist area and fingers and numbness.  Plaintiff requested an electromyography (EMG) and referral to neurology.  (Ulit Decl. ¶ 29; 7/23/13 MPN, ECF No. 84-11 at 43.)

80.   On July 23, 2013, Defendant Ulit performed a neurological examination and assessed a positive Tinel's sign on Plaintiff's left wrist, no atrophy of muscle strength, and sensory claims of mild decreased sensation.  As a result of these findings, Defendant Ulit assessed that Plaintiff possibly had carpal tunnel syndrome.  (Id.)

81.   Defendant Ulit assessed that an EMG should be done prior to the referral because the results may indicate that neurology would be inappropriate and on July 27, 2013 submitted an RFS for a nerve conduction study (NCS) and EMG, which was approved on July 29, 2013 by Dr. Beregovskaya.  (Ulit Decl. ¶¶ 29, 31, 32; 7/23/13 MPN, ECF No. 84-11 at 43; 7/23/13 Physician's Orders, ECF No. 84-11 at 46.)

82.   An EMG measures muscle response and is used to detect abnormalities.  A related exam is the NCS which can determine nerve damage and destruction and is often performed at the same time as an EMG.  (Ulit Decl. ¶ 30; Moon Decl. ¶ 17.)

83.   EMG and NCS are not performed by a neurologist and are done prior to ascertain the appropriate specialist for referral.  (Id.)

84.   Dr. Beregovskaya approved the RFS and Plaintiff's NCS was scheduled for September 20, 2013.  (Ulit Decl. ¶ 32; 9/20/13 RFS, ECF No. 84-11 at 50.)

85.   Although Plaintiff alleges that he was seen by Defendant Moon on September 9, 2013, there is no record of an appointment with Defendant Moon on September 9, 2013.[14]

86.   On September 20, 2013, at the site of Plaintiff's NCS testing, Plaintiff refused to have his vital signs tested and refused a medical evaluation in the treatment and triage area.[15]

---

[14] Plaintiff stipulates that there is no record of an appointment on September 9, 2013.

[15] Plaintiff objects on the ground of hearsay.  Dr. Moon's declaration referred to a refusal of examination and/or treatment form signed by Plaintiff on September 20, 2013.  (ECF No. 84-12 at 29.)  On summary judgment, the court does not focus on the admissibility of the form of the evidence, but on the admissibility of its contents.  Fraser

(Moon Decl. ¶ 20, 9/20/13 Refusal of Examination and/or Treatment, ECF No. 84-12 at 29.)

87.     On September 30, 2013, Defendant Moon met with Plaintiff to follow up on the nerve conduction study that had been done on September 20, 2013 but had not yet received the results.  (Moon Decl. ¶ 16; 9/30/13 Treatment Notes, ECF No. 84-12 at 19.)

88.     On September 30, 2013, Defendant Moon performed a physical examination of Plaintiff and reviewed his medical records and assessed that the cause of numbness in the fingers of his right hand was likely the result of CTS.  (Id.)

89.     For the purposes of submitting an RFS for referral to an orthopedic surgeon with the requisite medical evidence, Defendant Moon determined that the results of the NCS were required to confirm his diagnosis and that once he received the results, he could submit the RFS for Plaintiff.   Defendant Moon communicated his assessment and plan to Plaintiff who verbalized understanding.  (Id.)

90.     On October 22, 2013, Defendant Moon had a follow-up appointment with Plaintiff and reviewed the results of the NCS which concluded that Plaintiff had moderate to severe right CTS, and no electrophysiological evidence of ulnar neuropathy, radiculopathy, or polyneuropathy of the right arm.  Defendant Moon informed Plaintiff he would submit a referral to an orthopedic surgeon and Plaintiff verbalized understanding of Dr. Moon's assessment and plan.  (Moon Decl. ¶ 18; 10/20/13 Progress Note, ECF No. 84-12 at 22.)

91.     On October 22, 2013, Defendant Moon submitted an RFS that Plaintiff receive an initial outpatient consultation with an orthopedic surgeon based on the NCS findings and a diagnosis of CTS.  (Moon Decl. ¶ 19; 10/22/13 PRS, ECF No. 84-12 at 27.)

92.     On November 9, 2013, Defendant Moon was informed that the RFS had been denied by Dr. Beregovskaya because he had not included documentation of his physical findings such as "weakness of thenar muscle" or "atrophy of thenar muscle," pursuant to InterQual criteria, and was directed to review InterQual and then resubmit the RFS.  (Moon Decl. ¶ 21; November 2, 2013 PRS, ECF No. 84-12 at 31.)

---

v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  Plaintiff's medical records are admissible evidence and Plaintiff's refusal to receive an evaluation would be admissible evidence at the trial of this matter.  Plaintiff's objection on the ground of hearsay is denied.

93.     Defendant Moon did not intentionally omit the InterQual criteria information from the RFS.  (Moon Decl. ¶ 22.)

94.     On November 26, 2013, Defendant Moon met with Plaintiff in order to conduct a physical examination to obtain the information required for resubmission of the RFS.  (Moon Decl. ¶ 23; 11/26/13 Progress Note, ECF No. 84-12 at 33.)

95.     On November 26, 2013, Defendant Moon attempted to review Plaintiff's medical records and lnterQual guidelines pursuant to Beregovskaya's instructions but the Electronic Unit Health Record ("eUHR") system was down and he was not able to obtain the requisite information.  (Id.)

96.     On November 26, 2013, Defendant Moon informed Plaintiff that the RFS had been denied and that he had been unable to access Plaintiff's medical records on eUHR, and asked Plaintiff to come in for a follow-up appointment in two weeks so that he could submit an RFS imminently.  Plaintiff verbalized understanding of Defendant Moon's assessment and plan. (Id.)

97.     On December 10, 2013, Defendant Moon examined Plaintiff and assessed that his right thumb evidenced no atrophy but it was weaker than his left side and again reviewed the results of the NCS as eHUR was working.  (Moon Decl. ¶ 24; 12/10/13 Progress Note, ECF No. 84-12 at 35.)

98.     On December 10, 2013, Defendant Moon informed Plaintiff that he would submit a new RFS requesting consultation with an orthopedic surgeon based on a diagnosis of CTS evidenced by the test results and the weakness in his right hand.  Plaintiff verbalized understanding of Defendant Moon's assessment and plan.  (Id.)

99.     On December 10, 2013, Defendant Moon resubmitted the RFS which was approved by Dr. Beregovskaya on December 12, 2013.  (Moon Decl. ¶ 26; 12/10/13 Physician's Order, ECF No. 84-12 at 37, 39, 41.)

100.    Plaintiff was scheduled for a consultation with Dr. David Smith, an orthopedic surgeon, on January 31, 2014.  (Moon Decl. ¶ 27; 12/12/13 PRS, ECF No. 84-12 at 41.)

101.    On January 31, 2014, Dr. Smith assessed that Plaintiff had a positive Phalen's test

and positive Tinel's sign over the carpal canal and had weakness of the thenar musculature and the results of the EMG were consistent with his examination.  (January 31, 2014 Memorandum, ECF No. 84-6 at 110.)

102.    On January 31, 2014, Dr. Smith assessed that Plaintiff had responded very well following carpal tunnel release surgery on his left side and had no further symptoms on his left hand.  (Id.)

103.    On January 31, 2014, Dr. Smith recommended Plaintiff undergo carpal tunnel release surgery for his right hand, put in a request for the surgery and would try to get it scheduled.  (Id.)

104.    On April 23, 2014, Defendant Moon submitted an order for blood tests to check Plaintiff's thyroid function in anticipation of surgery.  (Moon Decl. ¶ 29; 4/23/14 Physician's Orders, ECF No. 84-12 at 46.)

105.    On July 31, 2014, Defendant Moon had a follow up appointment with Plaintiff and informed him that if he wanted Dr. Smith to perform the surgery it would have to be delayed because he had learned that Dr. Smith had gone out on leave.  (Moon Decl. ¶ 30; 7/31/14 CCPN, ECF No. 84-12 at 48.)

106.    On July 31, 2014, Plaintiff informed Defendant Moon that he preferred to wait for Dr. Smith to return and verbalized his understanding that because of his decision, the surgery would be delayed.  (Id.)

107.    On August 25, 2014, Defendant Moon met with Plaintiff regarding his prior request to wait for Dr. Smith to return from leave and Plaintiff informed Defendant Moon that he changed his mind and did not want to wait any longer.  (Moon Decl. ¶ 32; 8/25/14 Progress Note ECF No. 84-12 at 52.)

108.    On August 25, 2014, Defendant Moon examined Plaintiff and assessed there was no deformity and no atrophy in his right hand and told Plaintiff he would submit an RFS for referral to a different orthopedic surgeon. Plaintiff verbalized understanding of Defendant Moon's assessment and plan.  (Id.)

109.    On August 25; 2014, Defendant Moon submitted a physician's order and an RFS

requesting Plaintiff receive a consultation with an orthopedic surgeon which was approved by Dr. Beregovskaya on August 26, 2014.  (Moon Decl. ¶¶ 33, 34, 35; 8/25/14 Physician's Orders, ECF No. 84-12 at 54; 8/26/14 RFS, ECF No. 84-12 at 58.)

110.    Plaintiff was scheduled for a consultation with Dr. Clemont Alade on September 12, 2014.  (Moon Decl. ¶ 35; 8/26/14 RFS, ECF No. 84012 at 58.)

111.    On September 25, 2014, Defendant Moon had a follow up appointment with Plaintiff regarding his consultation with Dr. Alade and the plan that Plaintiff undergo surgery for decompression of the right wrist.  (Moon Decl. ¶ 36; 9/25/14 Progress Note; ECF No. 84-12 at 60.)

112.    On September 25, 2014, Defendant Moon had not yet received the report from Dr. Alade and could not submit an RFS for the surgery until he determined whether it was recommended.  Defendant Moon submitted an order requesting Dr. Alade's report.  (Id.; 9/25/14 Physician's Orders, ECF No. 84-12 at 62.)

113.    On October 20, 2014, Defendant Moon had a follow up appointment with Plaintiff and found Dr. Alade's notations on the RFS form from his September 12, 2014 appointment that indicate a finding of right CTS and a plan for outpatient surgery for right median nerve decompression at the right wrist.  (Moon Decl. ¶ 38; 10/20/14 Progress Note, ECF No. 84-12 at 64.)

114.    On October 20, 2014, Defendant Moon examined Plaintiff's right hand and found no atrophy but numbness in the 2nd and 3rd fingers.  (Id.)

115.    On October 20, 2014, Defendant Moon submitted an RFS for Plaintiff to undergo carpal tunnel release surgery which was approved by Dr. Beregovskaya on October 21, 2014.  (Moon Decl. ¶ 39; 10/20/14 Physician's Orders, ECF No. 84-12 at 66; 10/20/14 RFS, ECF No. 84-12 at 68.)

116.    On November 18, 2014, Plaintiff had carpal tunnel release surgery to his right wrist, with a 14-day work lay-in.  (August 26, 2015 Directors Level Appeal, ECF No. 84-10 at 67; 11/18/14 Physician's Orders, ECF No. 84-7 at 99.)

117.    On November 18, 2014, Plaintiff started taking acetaminophen with codeine

1 prescribed by Dr. Beregovskaya for 14-days post-surgery pain.   (11/19/14 Medication
2 Reconciliation, ECF No. 84-7 at 97; 11/26/14 Medication Reconciliation, ECF No. 84-7 at 120.)

3 118.   On November 26, 2014, Defendant Moon had a follow up appointment with
4 Plaintiff to check on his recovery from surgery, during which Plaintiff complained that his pain
5 from surgery was not controlled even though he had been taking the codeine which was a
6 powerful narcotic and requested more pain medication.   (Moon Decl. ¶ 42; 11/26/14 Progress
7 Note, ECF No. 84-12 at 70.)

8 119.   On November 26, 2014, Defendant Moon denied the request for additional pain
9 medication but agreed to prescribe morphine to replace the codeine.   Plaintiff verbalized
10 understanding of Defendant Moon's assessment and plan.  (Id.)

11 120.   On November 26, 2014, Defendant Moon submitted an order to cancel Plaintiff's
12 prescription for codeine and requested a new prescription for morphine sulfate IR 15 mg, be
13 provided through December 2, 2014.  (Moon Decl. ¶ 44, 11/26/14 Medication Reconciliation,
14 ECF No. 84-12 at 74.)

15 121.   On December 5, 2014, Plaintiff had an appointment with Dr. Alade during which
16 he was seen and evaluated for an orthopedic follow up at which time his sutures were removed,
17 he received a wrist brace, and was advised to exercise his hand.  (12/5/14 Physician's Orders,
18 ECF No. 84-12 at 76.)

19 122.   At Plaintiff's appointment on December 5, 2014, he refused assessment from an
20 RN with no vitals.  (Moon Decl. ¶ 46; Refusal of Examination and/or Treatment, ECF No. 84-12
21 at 218.)

22 123.   On December 10, 2014, Defendant Moon met with Plaintiff after receiving a
23 Medication No Show/Refusal Referral and counseled Plaintiff as to the purpose of the
24 medication and the importance of taking it regularly so as to control his nerve pain.  (Moon Decl.
25 ¶ 47; 12/10/14 Progress Note, ECF No. 84-12 at 80.)

26 124.   On December 10, 2014, Plaintiff said he did not understand why he had to see a
27 nurse for missing his medication since it was prescribed on an as needed basis only.  (Id.)

28 125.   On December 18, 2014, Defendant Moon had not received a report from Dr.

1   Alade but assessed from his own physical examination of Plaintiff, that the wound from surgery
2   on his right hand had healed well.  (Moon Decl. ¶ 48; 12/18/14 Progress Note, ECF No. 84-12 at
3   82.)

4   126.    On December 18, 2014, Defendant Moon informed Plaintiff he would submit
5   another request for Dr. Alade's report and then meet with Plaintiff the following week.  Plaintiff
6   verbalized understanding of Defendant Moon's assessment and plan.  (Id.)

7   127.    On December 18, 2014, Defendant Moon submitted an order that his prior request
8   for Dr. Alade's report be followed up on.  (Moon Decl. ¶ 49; 12/18/14 Physician's Orders, ECF
9   NO. 84-12 at 84.)

10   128.    On December 24, 2014, Defendant Moon had a follow up appointment with
11   Plaintiff and assessed the right hand surgical site was healed, still seemed mildly swollen and
12   tender but was setting better from the swelling that occurred after surgery.  (Moon Decl. ¶ 50;
13   12/24/14 Progress Note, ECF No. 84-12 at 86.)

14   129.    On December 24, 2014, Defendant Moon advised Plaintiff that swelling was a
15   natural response after surgery and that narcotics were not appropriate medication for Plaintiff's
16   pain.  Plaintiff requested that his prescription for Ibuprofen be continued.  (Id.)

17   130.    On December 24, 2014, Defendant Moon submitted an RFS for Plaintiff to have a
18   four-week follow-up appointment with Dr. Alade.  (Moon Decl. ¶ 51; 12/24/14 Physician's
19   Orders, ECF No. 84-12 at 88.)

20   131.    Plaintiff was seen for an orthopedic follow up appointments with Dr. Alade on
21   January 2, 2015[16] and February 13, 2015, regarding his carpal tunnel surgery.  (Moon Decl. ¶ 52;
22   1/2/15 Physician's Order, ECF No. 84-12 at 88; 2/20/15 Progress Note, ECF No. 84-12 at 90.)

23   132.    On February 20, 2015,[17] Defendant Moon had an appointment with Plaintiff
24   regarding his orthopedic follow ups with Dr. Alade during which Plaintiff complained that he
25   was still not able to make a fist.  (Moon Decl. ¶ 52; 2/20/15 Progress Note, ECF No. 84-12 at

26

27   [16] Dr. Moon states that the first follow up was February 5, 2015, however Dr. Alade's note is dated January 2, 2015.

28   [17] The undisputed fact states that this appointment took place on February 23,2015, however the progress note is dated February 20, 2015.

22

90.)

133.    On February 20, 2015, Defendant Moon's review of Dr. Alade's notes led him to determine that Dr. Alade recommended Plaintiff continue with exercises and also recommended physical therapy but an RFS had not been submitted.  (Id.)

134.    On February 20, 2015, Defendant Moon performed a physical examination of Plaintiff which evidenced the right hand surgical site was clean, and swelling in one finger and determined that a request for physical therapy should be made.  (Id.)

135.    On February 23, 2015, Defendant Moon submitted an RFS that Plaintiff be referred to physical therapy which was approved.  (Moon Decl. ¶ 53; 2/23/15 Physician's Orders, ECF No. 84-12 at 92; 2/25/15 RFS, ECF No. 84-12 at 95.)

136.    On March 10, 2015, Plaintiff met with the physical therapist who assessed Plaintiff was able to make a 70% fist[18] and provided Plaintiff with therapeutic exercises to increase his strength and alleviate the pain.  (Moon Decl. ¶ 55; 3/10/15 PT Note, ECF No. 84-12 at 97-98.)

137.    On March 10, 2015, the physical therapist recommended Plaintiff for 6 sessions of physical therapy and gave the prognosis of "fair" that Plaintiff's pain and strength would improve.  (Moon Decl. ¶ 55; 3/10/15 PT Note, ECF No. 84-12 at 98.)

138.    Plaintiff completed six sessions of physical therapy during April 2015.  (Moon Decl. ¶ 55; PT Notes, ECF No. 84-12 at 101-104.)

139.    On April 22, 2015, Plaintiff was discharged from physical therapy, found to have progressed very well, and encouraged to continue with his exercises for strength and flexibility. Moon Decl. ¶ 56; 4/22/15 PT Discharge Summary, ECF No. 84-12 at 106.)

140.    Defendant Wang was not directly involved in Plaintiff's medical care until May 14, 2015,[19] when he first saw Plaintiff for a follow up to his physical therapy sessions.  (Wang Decl. ¶ 21.)

---

[18] The physical therapy notes state that Plaintiff was able to make a 75% active fist.  (3/10/15 PT Note, ECF No. 84-2 at 97.)

[19] Dr. Wang states that he began seeing Plaintiff on May 15, 2015.  However, the progress notes shows that date of service as May 14, 2015.  (5/14/15 Progress Note, ECF No. 84-13 at 16.)

141.    On May 14, 2015, Plaintiff complained that he had numbness in his right hand ulnar side and wanted to change his pain medication from ibuprofen and gabapentin to an NSAID.  (Wang Decl. ¶ 22; 5/14/15 Progress Note, ECF No. 84-13 at 16.)

142.    On May 15, 2015, Defendant Wang performed a physical examination of Plaintiff and assessed that Plaintiff's hand pain was likely the result of overuse and planned to submit an order for naproxen to relieve Plaintiff of his pain which was communicated to Plaintiff.  (Id.)

143.    Defendants Moon, Ulit, and Wang were not employed at CSP-COR for any part of 2016.  (Moon Decl. ¶ 61; Ulit Decl. ¶ 37; Wang Decl. ¶ 25.)

**V.**

**DISCUSSION**

Defendants contend that the undisputed medical evidence demonstrates that they were not deliberately indifferent to Plaintiff's medical needs.  Defendants argue that they provided appropriate medical services under InterQual criteria guidelines, and other UM policies and procedures, and did not cause or contribute to Plaintiff's alleged injuries.  Defendants assert that Plaintiff has no evidence that any "delay" in testing or treatment caused Plaintiff muscle or nerve damage and the evidence shows that he received a substantial amount of care and attention for the pain in his right hand, wrist, and arm.

Defendants argue that even if Plaintiff can show that his medical needs were serious, he cannot show that the defendants were deliberately indifferent because there is no evidence that Defendants failed to address his medical needs.  Defendants contend that the medical evidence shows that Plaintiff underwent carpal tunnel surgery and was prescribed post-operative care, including medication and physical therapy.   Further, Defendants argue that Plaintiff has presented no evidence that his medical treatment was delayed, and even were he to do so delay without more is insufficient to state a claim for deliberate indifference.

Plaintiff counters that he was denied treatment for his pain and testing was delayed despite empirical evidence that was verified by the neurologist relevant to the MRI results. Plaintiff contends that he was refused pain medication despite the nerve conduction study showing that he had CTS and a cervical spine injury.  Plaintiff asserts that, as chief medical

1   officer, Defendant Wang was Defendants Ulit and Moon's supervisor, and Defendant Wang
2   failed to respond in a timely manner.  Plaintiff contends that Defendants had ample time to
3   address Plaintiff's medical issues and the undisputed facts show that they did not do so.
4   Defendants did not follow Dr. Smith's recommendation that Plaintiff receive surgery for his
5   carpal tunnel resulting in long term suffering and pain.

6       **A.      Deliberate Indifference Legal Standard**

7       While the Eighth Amendment of the United States Constitution entitles Plaintiff to
8   medical care, the Eighth Amendment is violated only when a prison official acts with deliberate
9   indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th
10  Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th
11  Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d
12  1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating
13  that failure to treat [his] condition could result in further significant injury or the unnecessary and
14  wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately
15  indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  Deliberate indifference
16  is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical
17  need, and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d
18  at 1096).  The requisite state of mind is one of subjective recklessness, which entails more than
19  ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted);
20  Wilhelm, 680 F.3d at 1122.

21      A difference of opinion between a physician and the prisoner - or between medical
22  professionals - concerning what medical care is appropriate does not amount to deliberate
23  indifference."  Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.
24  1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.
25  1986)).  Rather, Plaintiff "must show that the course of treatment the doctors chose was
26  medically unacceptable under the circumstances and that the defendants chose this course in
27  conscious disregard of an excessive risk to [his] health."  Snow, 681 F.3d at 988 (citing Jackson,
28  90 F.3d at 332) (internal quotation marks omitted).

**B.    Serious Medical Need**

Deliberate indifference has both an objective and a subjective component.   Wilson v. Seiter, 501 U.S. 294, 298 (1991).   The objective component considers whether the deprivation was sufficiently serious and the subjective component considers if the officials acted with a sufficiently culpable state of mind.   Wilson, 501 U.S. at 298.)   Although Defendants state that even if Plaintiff can establish that he had a serious medical need, neither party addresses whether Plaintiff had a serious medical need.

"Indications that a plaintiff has a serious medical need include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain." Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation marks omitted); accord Wilhelm, 680 F.3d at 1122; Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).

Here, the evidence before the Court demonstrates that Plaintiff suffered from CTS of his right upper extremity.   Plaintiff was continually prescribed some type of pain medication which, at least in part, was to address his right hand, wrist, and arm pain and it was ultimately recommended by both Drs. Smith and Alade that Plaintiff required surgery.   Plaintiff ultimately had a right carpal tunnel release.   The Court finds that Plaintiff had a serious medical need.

**C.    Deliberate Indifference**

Plaintiff contends that Defendants violated section 3350 of Title 15 of the California Code of Regulations[20] which dictates legal process and protocols.   Deliberate indifference is not established by the failure to follow state regulations.   Peralta, 744 F.3d at 1087; Case v. Kitsap Cty. Sheriff's Dep't, 249 F.3d 921, 929 (9th Cir. 2001).   There is no liability under section 1983 for violating prison regulations.   Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009). Plaintiff must show that Defendants violated the constitutional right at issue.   A prison official acts with "deliberate indifference ... only if the [prison official] knows of and disregards an

---

[20] This section was renumbered Cal. Code Regs. tit. 15, § 3999.200.  Section 3999.200 sets forth only medically necessary services shall be provided and sets forth specific services that are not considered medically necessary.

excessive risk to inmate health and safety."  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir.2002)).  The Court considers whether Defendants acted with deliberate indifference in treating Plaintiff's right hand, wrist and arm pain.

       1.   Defendant Ulit

Defendant Ulit contends that Plaintiff claims he was deliberately indifferent because the first RFS was denied and on two different occasions Defendant Ulit examined him and, despite alleged clinical evidence of causation of the pain, Plaintiff was refused medication other than ibuprofen.  However, Defendant Ulit asserts that he timely submitted the RFS and was not responsible for the denial.  Defendant Ulit argues that the decision to deny Plaintiff's request to see a neurosurgeon in February 2013 was consistent with the established medical policies and procedures and was not deliberately indifferent.

Plaintiff was seen by Defendant Ulit on February 15, 2013 and complained of pain in his right arm that radiated down to his elbow.  (U.F. 51.)  Defendant Ulit determined that ibuprofen and gabapentin were the proper method to treat Plaintiff's pain in light of his symptoms.  (U.F. 53.)  He also submitted a request for a neurology consult.  (U.F. 55.)  The request for a neurology consult was denied by Dr. Beregovskaya who ordered that clinical management was appropriate. (U.F. 61.)  On April 9, 2013, Defendant Ulit assessed that clinical management would continue and that Plaintiff should avoid traumatic activity.  (U.F. 67.)

Plaintiff saw Dr. Clark on April 23, 2013, who considered whether to submit an RFS. (U.F. 73.)  Dr. Clark wrote out an RFS but did not submit it because he found that Plaintiff did not meet the InterQual criteria due to his thyroid and Plaintiff had to proceed with clinical management.  (U.F. 73.)

Defendant Ulit next saw Plaintiff when he was notified that Plaintiff had not been taking his medication as prescribed.  (U.F. 75.)  Plaintiff requested for Defendant Ulit to change his medication to as needed only.  (Id.)  Defendant Ulit examined Plaintiff, and assessed that there could still be a nerve problem so he ordered a brace for Plaintiff and continued Plaintiff's Motrin and gabapentin on as needed basis as requested by Plaintiff.  (U.F. 77.)  Defendant Ulit had

1    determined that Plaintiff's thyroid was well managed and that his pain could be a nerve issue.

2    (Ulit Decl. ¶ 27.)

3          Defendant Ulit saw Plaintiff on July 23, 2013, and based on his examination determined

4    that Plaintiff may have CTS.  (U.F. 80.)  Defendant Ulit submitted an RFS for NCS/EMG which

5    was approved.  (U.F. 81.)  Defendant Ulit determined that referring Plaintiff to a specialist

6    without the tests being completed would be superfluous.  (Ulit Decl. ¶ 29.)  These tests were

7    requested to determine the appropriate specialist for the referral.  (U.F. 83.)  Defendant Ulit has

8    presented evidence that referral for an EMG is not routine but provided where there is suspected

9    nerve compression and the patient's pain has continued to worsen after clinical treatment with

10   medication, reduced activities and the regular use of a brace.  (U.F. 30.)

11         Additionally, Defendant Ulit contends that the undisputed facts demonstrate that he did

12   not only provide ibuprofen for Plaintiff's complaints of pain.  The undisputed facts show that, in

13   addition to ibuprofen, Plaintiff was prescribed gabapentin for nerve pain.  (U.F. 53, 57, 59, 67,

14   77.)  However, Plaintiff was not taking his medication as directed and requested that it be

15   prescribed on an as needed basis.  (U.F. 74, 75.)   Defendant Ulit also prescribed a wrist splint

16   for Plaintiff but he was not using the splint that he was provided.  (U.F. 77, 78.)

17         Defendants have also presented evidence that the treatment provided by Defendant Ulit,

18   medications and a wrist splint, was appropriate for pain associated with CTS and other nerve

19   conditions of the upper extremities.  (U.F. 33, 34, 36, 37, 40, 42, 43, 44.)  Further, Defendant

20   Ulit submitted the RFS in February 2013, but it was denied by Dr. Beregovskaya who

21   determined that clinical management was appropriate.  (U.F. 61.)  On April 23, 2013, Dr. Clark

22   determined that Plaintiff did not meet the criteria for referral to an orthopedist due to his thyroid

23   levels.  (U.F. 73.)  When Defendant Ulit next saw Plaintiff on July 16, 2013, he ordered the wrist

24   splint.  (U.F. 77.)  On July 23, 2013, having determined that Plaintiff's thyroid levels were well

25   managed, Defendant Ulit submitted an RFS for an NCS and EMG which were approved.  (U.F.

26   81.)  This was Defendant Ulit's last visit with Plaintiff as his PCP and Defendant Moon became

27   Plaintiff's PCP in September 2013.  (U.F. 3, 4.)

28         Defendant Ulit has met his initial responsibility of identifying those portions of the record

28

that show there is no genuine issue of material fact that he was deliberately indifferent to Plaintiff's serious medical needs.  Celotex Corp., 477 U.S. at 322.  The burden shifts to Plaintiff to establish that a genuine issue as to any material fact actually exists.  Matsushita Elec. Indus. Co., 475 U.S. at 586.

In his opposition, Plaintiff counters that Defendant Ulit referred him to Dr. Smith and did not support the recommendation that Plaintiff receive surgery.  However, the evidence before the court shows that Defendant Ulit did not refer Plaintiff to Dr. Smith nor did he disregard a recommendation that Plaintiff should have surgery.  Defendant Ulit submitted a request for services seeking to have Plaintiff referred to a neurologist.  In order to obtain a referral, CDCR requires that the InterQual criteria be met to demonstrate medical necessity.  (U.F. 18, 26.)  Dr. Beregovskaya denied the RFS submitted by Defendant Ulit because he determined that Plaintiff should continue with clinical management because he did not meet the InterQual criteria for referral.  (U.F. 61, 62.)

On July 23, 2013, his last appoint as Plaintiff's PCP, Defendant Ulit referred Plaintiff for an NCS/EMS which was approved.   Plaintiff did not see Dr. Smith and receive a recommendation for surgery until January 31, 2014 approximately six months after Defendant Ulit was his PCP.  (U.F. 3, 103.)  Therefore, Plaintiff has not demonstrated that Defendant Ulit disregarded any recommendation that Plaintiff have surgery for his right CTS.

Plaintiff also asserts that Defendant Ulit did not deny that he told Plaintiff to "deal with it" thus admitting that he was deliberately indifferent to Plaintiff's pain.  Plaintiff relies on Beard v. Banks, 548 U.S. 521 (2006), in which the Supreme Court stated, "by failing specifically to challenge the facts identified in the" moving party's statement of undisputed facts, the opposing party is deemed to have admitted the validity of the facts contained therein.  However, in Beard the moving party had set forth a statement of undisputed facts that had not been addressed by the opposing party.  Id.  Here, Plaintiff made the statement in the second amended complaint and Defendant has denied that the statement was made in their answer to the second amended complaint.  (Answer ¶ 11, ECF No. 31.)

Further, even if the statement was deemed admitted, Plaintiff has failed to establish that

Defendant Ulit made this statement in relation to the claims that are proceeding in this action.  In his second amended complaint, Plaintiff states that he had surgery by Dr. Smith for his left CTS on January 11, 2012, that he required pain medication, and Defendant Ulit told him to deal with it and would not prescribe medication for pain.  (SAC ¶¶ 5, 6.)  However, as the Court previously found, Plaintiff has only exhausted his administrative remedies as to his complaints of right hand, wrist and arm pain.  Such a statement made by Defendant Ulit after Plaintiff's surgery on his left hand does not demonstrate that Defendant Ulit was deliberately indifferent in treating Plaintiff's right hand, wrist, and arm pain.  Plaintiff has failed to demonstrate that the statement has any connection to the allegations regarding his right hand, wrist and arm pain that are proceeding in this action.

Plaintiff's complaint alleges that he did not receive any pain medication after May 28, 2012; he saw Defendant Ulit on December 7, 2012, and was not prescribed pain medication; and over the next two months he complained of worsening pain in his right hand.  (SAC ¶¶ 9, 10.)  In his opposition to the current motion, Plaintiff argues that on May 28, 2012, and December 7, 2012 he was denied pain medication with a statement that there was nothing wrong with him despite diagnostic findings demonstrating otherwise.

Plaintiff has not presented any evidence that he complained of pain in his right hand, arm or wrist at the May 2012 appointment.  The Court was unable to find a record of a May 28, 2012 visit with Defendant Ulit, but the medical record shows that Plaintiff was seen by Defendant Ulit on May 29, 2012, for lab results and to follow up on his gout, anemia, and hypothyroidism.  (5/29/12 Chronic Care Followup Visit, ECF No. 84-8 at 117.)  Plaintiff was not having an acute attack of his gout on that date.  (Id.)  He had mild anemia and his B12 was quite low.  (Id.)  He was hypothyroid and his triglycerides were mildly elevated.  (Id.)  Plaintiff had an unremarkable physical examination.  (Id.)  Defendant Ulit found that Plaintiff had mild anemia and would be given oral replacement.  (Id.)  His hypothyroidism was mild and under fair control and he was started on 25 mg of thyroid medication.  (Id.)  Plaintiff's gout medication was decreased.  (Id.)  Plaintiff complained of a right ear infection and his throat was red and the right ear was dull.  (Id.)  Plaintiff was prescribed azithromycin.  (Id.)  He was recommended to diet and exercise for

1   his hypertriglyceridemia.  (Id.)  Plaintiff was to follow up in thirty days.  (Id.)

2       Plaintiff was seen by Defendant Ulit on December 7, 2012.  (12/7/12 Progress Note, ECF

3   No. 84-9 at 3.)   Plaintiff was seen for a follow up of his anemia, gout, hypothyroidism,

4   dyslipidemia/hypertriglyceridemia  possibly  secondary  to  hypothyroidism,  neck  pain  with

5   radiculopathy, and foot deformity.  (Id.)  Plaintiff said that he was doing fine and had no

6   complaints except neck pain that was radiating down into the right arm with no numbness or

7   weakness.  (Id.)  Plaintiff had been prescribed gabapentin and ibuprofen for pain.  (Id.)  On

8   examination, Plaintiff's neck was supple and his neck range of motion was good.  (Id.)  Plaintiff

9   had no tenderness in the neck spine and motor and sensory in the extremities was intact.  (Id.)

10  As to Plaintiff's neck pain, Defendant Ulit noted that Plaintiff was already on gabapentin.  (Id.)

11  He requested the MRI that had been done in 2011 and noted "will go from that point."  (Id.)

12      Further  the  medication  reconciliation  statements  show  that  on  November  30,  2012,

13  Defendant Ulit prescribed a ninety day supply of gabapentin to be used as needed for nerve pain.

14  (11/30/12 Medication Reconciliation, ECF No. 84-7 at 30.)  The expected duration of the therapy

15  was six months.  (11/30/12 Nonformulary Drug Request, ECF No. 84-7 at 37.)  The medication

16  was not discontinued on December 7, 2012, and Plaintiff also had a prescription for ibuprofen to

17  be taken three times per day.  (12/7/12 Medication Reconciliation, ECF No. 84-7 at 40.)

18      Defendant Ulit has presented evidence that he did prescribe Plaintiff medication to

19  address Plaintiff's right hand, wrist, and arm pain prior to December 7, 2012, and the pain

20  medication was continued during the remainder of the period that he was Plaintiff's PCP.

21      Plaintiff argues that Defendant Ulit did not order further testing for more than a year

22  despite the neurologist determinations relevant to the MRI.  Plaintiff relies on his 2011 MRI

23  showing that he had spinal cord compression at C4-C5 and C6-C7 with narrowing of the spinal

24  cord at C6-C7 (SAC ¶ 3).  Plaintiff states that his cervical spine was causing pain to radiate to his

25  shoulders and arms and causing numbness of his face, arms and fingers.  (SAC ¶ 1.)  A witness

26  may testify to a matter where they have personal knowledge of the matter. Fed. R. Evid. 602.  A

27  lay witness may offer testimony in the form of an opinion where it is "(a) rationally based on the

28  witness's  perception;  (b)  helpful  to  clearly  understanding  the  witness's  testimony  or  to

1  determining a fact in issue; and (c) not based on scientific, technical, or other specialized

2  knowledge within the scope of Rule 702." Fed. R. Evid. 701.

3      The cause of Plaintiff's pain and numbness requires the testimony of a witness that has

4  specialized knowledge which would fall under Rule 702.  Under Rule 702, a doctor is an expert

5  witness due to his knowledge, skill, experience, training, or education and may testify in the

6  form of a medical opinion.  Fed. R. Evid. 702.  Plaintiff is not a doctor and cannot proffer

7  medical testimony in this matter.  (U.F. 50.)

8      Plaintiff has presented no evidence that his degenerative disc disease was a contributing

9  factor to his CTS.  Defendants have presented evidence that the majority of CTS is caused by

10  overuse of the hand or hypothyroid.  (U.F. 33.)  Additionally, Dr. Smith's January 31, 2014

11  examination notes state that it is the EMG and NCS done on September 20, 2013 that show that

12  Plaintiff had moderate to severe right CTS.  (ECF No. 86-4 at 110.)  Plaintiff's reliance on the

13  2011 MRI does not create a genuine issue of fact that would defeat the current motion for

14  summary judgment.

15      Plaintiff contends that Defendant Ulit delayed the surgery recommended by Dr. Smith

16  thereby contributing to Plaintiff's injury and irreversible damage.  But as discussed, Dr. Smith

17  did recommend surgery until after Defendant Ulit was no longer treating Plaintiff.  Plaintiff has

18  presented no evidence that surgery was recommended during the time that Defendant Ulit was

19  treating Plaintiff.  Plaintiff's disagreement with the course of treatment provided does not

20  amount to deliberate indifference." Snow, 681 F.3d at 987.  Plaintiff has not demonstrated that

21  the course of treatment Defendant Ulit chose was medically unacceptable under the

22  circumstances.  Id. at 988.  The only evidence before the Court shows that the treatment

23  Defendant Ulit provided to Plaintiff for his right hand, wrist, and arm pain was medically

24  acceptable.  (U.F. 30, 33, 34, 36, 38, 43, 44.)

25      Plaintiff has not met his burden of demonstrating that a genuine issue of material fact

26  exists as to Defendant Ulit.  The Court recommends that Defendant Ulit's motion for summary

27  judgment be granted.

28  / / /

2.   <u>Defendant Moon</u>

Defendant Moon argues that once he took over Plaintiff's treatment, he proactively and appropriately treated Plaintiff.  Defendant Moon first saw Plaintiff on September 30, 2013 as a follow up to the NCS that had been done on September 20, 2013.  (U.F. 87.)  Defendant Moon had not yet received the results of the NCS, but he did an examination of Plaintiff and assessed that the cause of the numbness in the fingers of his right hand was likely the result of CTS.  (U.F. 88.)  However, Defendant Moon needed the results of the NCS to confirm his diagnosis to submit an RFS.  (U.F. 89.)

Defendant Moon saw Plaintiff again on October 22, 2013 and reviewed the results of the NCS which showed that Plaintiff had moderate to severe CTS with no electrophysiological evidence of ulnar neuropathy, radiculopathy, or polyneuropathy of the right arm.  (U.F. 90.) Defendant Moon submitted an RFS for an initial consult with an orthopedic surgeon.  (U.F. 91.)

On November 9, 2013, Defendant Moon was informed that the RFS was denied because he had not included documentation of physical findings such as weakness or atrophy of the thenar muscle as required by the InterQual criteria.  (U.F. 92.)  Defendant Moon met with Plaintiff on November 26, 2013 to obtain the information required for him to resubmit the RFS.  (U.F. 94.)  He attempted to review Plaintiff's medical records, but the system was down and he could not obtain the relevant information.  (U.F. 95.)  Plaintiff was scheduled for a follow up appointment in two weeks so Defendant Moon could obtain the information and resubmit the RFS.  (U.F. 96.)

Defendant Moon saw Plaintiff on December 10, 2013, and resubmitted the RFS which was approved by Dr. Beregovskaya on December 12, 2013.  (U.F. 97, 99.)

Plaintiff saw Dr. Smith on January 31, 2014 who recommended a carpal tunnel release surgery for Plaintiff's right hand.  (U.F. 101, 103.)

On April 23, 2014, Defendant Moon submitted an order for Plaintiff to have blood work to check his thyroid function in anticipation of surgery.  (U.F. 104.)

Defendant Moon had a follow up with Plaintiff on July 31, 2014, and informed Plaintiff that Dr. Smith had gone out on leave and he would have to wait if he wanted Dr. Smith to

perform the surgery.  (U.F. 105.)  Plaintiff decided to wait for Dr. Smith to return.  (U.F. 106.)

Plaintiff had an appointment with Defendant Moon on August 25, 2014, and informed Defendant Moon that he no longer wanted to wait for Dr. Smith and wanted to be referred to another orthopedic surgeon.  (U.F. 107.)  Defendant Moon submitted an RFS that same day which was approved by Dr. Beregovskaya on August 26, 2014.  (U.F. 109.)

Plaintiff had a consultation with Dr. Alade on September 12, 2014.  (U.F. 110.)  Defendant Moon had a follow up with Plaintiff to address Dr. Alade's recommendation on September 25, 2014, but he had not yet received Dr. Alade's report.  (U.F. 111, 112.)  Plaintiff had a follow up on October 20, 2014, at which Defendant Moon saw that Dr. Alade had recommended outpatient surgery for right median nerve decompression of the right wrist.  (U.F. 113.)  Defendant Moon submitted a request for services that was approved by Dr. Beregovskaya on October 21, 2014.  (U.F. 115.)  Plaintiff had carpal tunnel release surgery to his right wrist on November 18, 2014.  (U.F. 116.)  Plaintiff received a 14 day work lay in and acetaminophen with codeine for post-surgical pain.  (U.F. 116, 177.)

Defendant Moon saw Plaintiff for a post-surgical follow up on November 26, 2014, and Plaintiff complained that the medication was not controlling his pain.  (U.F. 118.)  Defendant Moon replaced the codeine with morphine.  (U.F. 120.)  Plaintiff saw Dr. Alade on December 5, 2014 to have his sutures removed.  (U.F. 121.)  He received a wrist brace and was advised to exercise his hand.  (Id.)

Defendant Moon saw Plaintiff on December 10, 2014 after receiving notification that Plaintiff was not taking his medication as prescribed.  (U.F. 123.)  Plaintiff questioned why he had to see the nurse for missing his medication when it was on an as needed basis.  (U.F. 124.)  Defendant Moon saw Plaintiff on December 18, 2014 and assessed that Plaintiff's hand was healing well.  (U.F. 125.)  He had not received Dr. Alade's report so he scheduled an appointment with Plaintiff for the following week.  (U.F. 125, 126.)

On December 24, 2014, Defendant Moon saw Plaintiff for a follow up and noted that the hand seemed mildly swollen which was a natural response to surgery.  (U.F. 128, 129.)  Plaintiff had a follow up appointment with Dr. Alade and saw Defendant Moon on February 20, 2015.

(U.F. 131, 132.)  Plaintiff complained that he was not able to make a fist.  (U.F. 132.)  Defendant Moon realized that Dr. Alade had recommended physical therapy but an RFS had not been submitted.  (U.F. 133.)  He submitted an RFS for physical therapy which was approved.  (U.F. 135.)  Plaintiff began physical therapy on March 10, 2015, and was discharged on April 22, 2015.  (U.F. 136, 138, 139.)  The physical therapist found that Plaintiff had progressed very well and he was encouraged to continue with his exercises.  (U.F. 139.)

Defendant Moon has met his initial responsibility of identifying those portions of the record that show there is no genuine issue of material fact that he was deliberately indifferent to Plaintiff's serious medical needs.  Celotex Corp., 477 U.S. at 322.  The burden shifts to Plaintiff to establish that a genuine issue as to any material fact actually exists.  Matsushita Elec. Indus. Co., 475 U.S. at 586.

Plaintiff argues that on September 9, 2013 Defendant Moon saw him, however the medical evidence show that Plaintiff first saw Defendant Moon on September 30, 2013 to follow up on his September 20, 2013 nerve conduction study.  (U.F. 85, 87.)  Plaintiff states that Defendant Moon failed to treat his preexisting injury referring to the prior study in 2011. However, Plaintiff has presented no evidence of how the 2011 study would address his right hand, wrist, and arm pain.  As discussed, he has presented no evidence that his degenerative disc disease or spinal stenosis contributed to his CTS, and the prior NCS findings for his left hand in 2011 do not establish that he needed surgery for his right hand in 2012.

Plaintiff contends that Defendant Moon refused to treat him for his pain.  But the record demonstrates that Plaintiff was receiving gabapentin and ibuprofen for his pain.  (U.F. 10.) Defendant Moon continued to prescribe Plaintiff with gabapentin and ibuprofen.  Through the middle of October 2013, Plaintiff was receiving gabapentin two times per day, but starting on October 17, 2013, he started missing one dose approximately every other day and then on October 26, 2013, Plaintiff was only taking one dose every other day.   (Medication Administration Form, ECF No. 84-12 at 111.)   On November 25, 2013, Defendant Moon renewed Plaintiff's prescription for gabapentin.  (Medication Reconciliation, ECF No. 84-12 at 115; Nonformulary Drug Request, ECF No. 84-12 at 118.)  Plaintiff's acetaminophen continued

1   to be renewed.  (Medication Reconciliation Form, ECF No. 84-12 at 163, 178.)

2   In November 2013, Plaintiff was generally only taking one dose a day and did not take

3   any gabapentin on November 5 or 6 or 28.  (Medication Administration Record, ECF No, 84-12

4   at 218.)  In December 2013, Plaintiff missed one dose of his gabapentin the first week, did not

5   take any gabapentin on December 7, 8, 17, or 28, and generally took only one dose for the

6   remainder of the month.  (Medication Administration Record 84-12 at 119, 126.)  By January

7   2014, Plaintiff generally was taking one dose a day and missed taking his gabapentin on January

8   1, 11, and 25.  (Medication Administration Record, ECF No. 84-12 at 137.)  Plaintiff continued

9   this pattern through May 2014.  (Medication Reconciliation Record, ECF No. 84-12 at 139, 144,

10  153, 156.)  By June 2014, Plaintiff was only taking his gabapentin once a day and was not taking

11  any gabapentin once or twice a week.  (Medication Administration Record, ECF No. 84-12 at

12  166.)  Plaintiff continued to take his gabapentin once a day, missing days during the week

13  through the date of his surgery.  (Medication Administration Record, ECF No. 84-12 at 169, 173,

14  181, 186.)

15  Defendant Moon has presented evidence that he did prescribe medication for Plaintiff's

16  pain and that Plaintiff was not taking the medication as directed.  (U.F. 12, 13.)  No reasonable

17  trier of fact could find that Plaintiff's failure to receive medication for his pain was due any lack

18  of action by Defendant Moon but was due to Plaintiff's choice not to take the medication.  To the

19  extent that Plaintiff sought a different pain medication, the difference of opinion between the

20  inmate and physician about the best way to address pain has repeatedly been held not to create a

21  triable issue on the deliberate indifference prong of an Eighth Amendment claim.  Miller v.

22  California Dep't of Corr. & Rehab., No. 16-CV-02431-EMC, 2018 WL 534306, at *16 (N.D.

23  Cal. Jan. 24, 2018) (collecting cases).

24  Further, Defendants have presented evidence that gabapentin and ibuprofen are the

25  proper treatment for Plaintiff's pain.  (U.F. 43, 44.)  Plaintiff's disagreement with the treatment

26  provided is not sufficient to demonstrate deliberate indifference and he has not presented any

27  evidence that the treatment he received for his pain was medically unacceptable under the

28  circumstances.  Snow, 681 F.3d at 988

1    Plaintiff argues that the defendants ignored the recommendation of Dr. Smith and sought

2    alternative treatment and failed to appropriately and timely treat his CTS.  However, Defendants

3    have presented evidence that the treatment plan provided was clinically appropriate.  Plaintiff

4    was prescribed gabapentin to be taken two times per day, although the majority of the time he

5    only took his medication only once and on numerous days he did not take his medication at all

6    and he was provided with a wrist splint that he did not use.  Once Plaintiff's thyroid was

7    determined to be under control he was referred for NCS testing.  At this point, Defendant Moon

8    took over Plaintiff's care and referred him for a consultation with an orthopedic surgeon which

9    was approved.  (U.F. 99.)  Plaintiff had a consultation with Dr. Smith on January 31, 2014, and

10   surgery was recommended.  (U.F. 100.)

11   In his complaint, Plaintiff alleged that he was told by Dr. Smith that he needed to have

12   surgery within sixty days or permanent damage would occur.  (SAC ¶ 20.)  Defendants object

13   that this statement is inadmissible hearsay and Plaintiff has not submitted a declaration from Dr.

14   Smith nor is this statement contained in the medical records.  Hearsay is "a statement that: (1) the

15   declarant does not make while testifying at the current trial or hearing; and (2) a party offers in

16   evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).

17   Defendants' hearsay objection is sustained.

18   Further in his deposition, Plaintiff admitted that Dr. Smith never made the statement but

19   that he felt there was enough medical evidence that surgery should have been provided.  During

20   his deposition, Plaintiff stated that Dr. Alade told him that the damage starts the moment that

21   there is numbing and tingling in his hand.  (Pl. Depo. 151:8-10.)  Dr. Alade did not tell Plaintiff

22   that the surgery needed to be done immediately.  (Id. 151:14-16.)  No one ever told him that

23   surgery needed to be done immediately, but Plaintiff stated that there should have been enough

24   evidence because of his pain, the tingling and his inability to use his hand, the EMG that was

25   done on his hand, and Dr. Smith's recommendation that he needed surgery.  (Id. 151:17-152:3.)

26   No one told Plaintiff that he needed to have surgery within sixty days.  (Id. 152:15-21.)

27   However, Dr. Smith opined that Plaintiff needed surgery on January 31, 2014, and

28   Defendant Moon did not submit an RFT for surgery until almost seven months later in August

2014.  The record shows that on February 3, 2014, Defendant Moon saw Plaintiff for a follow up and entered an order for Plaintiff was to return in three months for lab work.  (ECF No. 84-7 at 86; ECF No. 84-9 at 170.)   Defendant Moon received and reviewed Dr. Smith's report on February 4, 2014.  (ECF No. 84-6 at 110.)

On April 23, 2014, Defendant Moon saw Plaintiff and submitted an order for Plaintiff to have blood work to check his thyroid function in anticipation of surgery and Plaintiff was to follow up the next week.  (U.F. 104, ECF No. 84-10 at 199.)  Plaintiff's blood was drawn and tested on April 24, 2014.  (ECF No. 84-5 at 89-90.)  Defendant Moon saw Plaintiff on July 31, 2014, and informed him that Dr. Smith was on leave; Plaintiff decided to wait for surgery until Dr. Smith returned.  (U.F. 106.)  Defendant Moon saw Plaintiff on August 25, 2014, at which time Plaintiff stated that he no longer wanted to wait for Dr. Smith to return and Defendant Moon submitted an RFS for referral to another orthopedist.  (ECF No. 84-6 at 119.)  The RFS was approved and Plaintiff had a consultation with Dr. Alade on September 12, 2014.  (ECF No 84-6 at 121.)

Defendant Moon does not address this six month delay between the date that he reviewed Dr. Smith's report and the appointment at which Plaintiff decided to wait on his surgery for Dr. Smith to return.   Further, following surgery, Dr. Alade prescribed physical therapy, but Defendant Moon did not submit an RFS until February 2015 noting that Dr. Alade had recommended physical therapy that had not been ordered.  (U.F. 133, 135.)

Even if there was a delay in providing Plaintiff with surgery or physical therapy after surgery, that is not enough to show deliberate indifference, the delay in providing surgery must have caused substantial harm.  Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)); McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).  Here, Plaintiff states that due to the delay he was denied medication to relieve his pain (SAC 12), however, as discussed above, Plaintiff was provided with pain medication and a wrist splint to address his complaints of pain.  Further, following surgery, Plaintiff was prescribed acetaminophen with codeine for post-surgery pain.  (U.F. 117.)  On

November 26, 2014, Plaintiff complained that the acetaminophen with codeine was not controlling his pain and Defendant Moon replaced the medication with morphine.  (U.F. 118, 119.)

Plaintiff argues that he was exposed to permanent damage and disfigurement as described by Dr. Smith, however, as discussed above, such statements are inadmissible hearsay and Plaintiff admitted in his deposition that Dr. Smith did not make such a statement.

Plaintiff has not presented any evidence that he suffered any substantial harm due to the failure to provide him with surgery on an earlier date.  The record consistently notes that Plaintiff had no atrophy in his hand despite some positive testing and weakness on the right prior to surgery.  (U.F. 80, 97, 101, 108, 114.)  Following surgery, Plaintiff's hand was found to be healing well.  (U.F. 125, 128, 134.)

Plaintiff was referred to physical therapy and had an initial assessment on March 10, 2015.  (U.F. 137.)  Physical Therapy Notes 84-12 at 41.)  Plaintiff was discharged from physical therapy on April 22, 2015.  (4/22/15 Physical Therapy Discharge Summary, ECF No. 84-6 at 146.)  Plaintiff reported that he was doing okay but still had soreness and difficulty gripping.  (Id.)  The record notes "Wrist Flex: 75, Ext: 75.  Incision well healed.  No atrophy, no swelling, no redness noted.  Wrist flex and ext = 4+/5 Rad dev/ulnar dev. = 4+/5."  (Id.)  Objectively Plaintiff was found to be "progressing very well."  (Id.)  He was to continue self exercises for strength and flexibility.  (Id.)  Plaintiff has not presented any evidence that he sustained any substantial harm from any delay in providing him with surgery or with physical therapy.  Compare Jett, 439 F.3d at 1098 (physician's own notes record the harm caused by the delay).

Plaintiff has not met his burden of demonstrating that a genuine issue of material fact exists as to Defendant Moon.  The Court recommends that Defendant Moon's motion for summary judgment be granted.

3.   Defendant Wang

Defendant Wang argues that there is no evidence to demonstrate that he was deliberately indifferent to Plaintiff's arm, wrist, and shoulder pain.  Rather, Defendants state that Plaintiff contends that Defendant Wang is liable because he supervised Defendants Ulit and Moon.

Plaintiff argues that Defendant Wang is liable because he supervised Defendants Ulit and Moon and he was required to be consulted by Dr. Beregovskaya in the denial of the RFS for the neurological consult.

### a.   Official Capacity

Plaintiff argues that Defendant Wang is liable in his official capacity.  However, this action is not proceeding against Defendant Wang in his official capacity.  "The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities."  Aholelei v. Dept. of Public Safety, 488 F.3d 1144, 1147 (9th Cir. 2007).  The Eleventh Amendment does not bar claims for prospective injunctive relief against an officer of the state who acts in his official capacity.  Flint v. Dennison, 488 F.3d 816, 825 (9th Cir. 2007); Cerrato v. San Francisco Cmty. Coll. Dist., 26 F.3d 968, 973 (9th Cir. 1994).

A suit brought against government officials in their official capacity is generally equivalent to a suit against the government itself.  McRorie v. Shimoda, 795 F.2d 780, 783 (9th Cir. 1986).  Therefore, officials may be held liable if "'policy or custom' . . . played a part in the violation of federal law."  McRorie, 795 F.2d at 783 (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985); Hafer v. Melo, 502 U.S. 21, 25 (1991).

In this action, Plaintiff is seeking only monetary damages and the second amended complaint did not allege that a policy or custom played a part in the denial of medical care.  For these reasons, this action is not proceeding against Defendant Wang in his official capacity.

### b.   Supervisory liability

Plaintiff seeks to hold Defendant Wang liable due to his position as chief medical officer arguing that he supervised Defendants Ulit and Moon and had to be consulted by Dr. Beregovskaya in deciding the RFS.  "Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013) (citation and internal quotation marks omitted); Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'"  Crowley, 734 F.3d at 977

(citation and internal quotation marks omitted).  Plaintiff has not demonstrated that Defendant Wang had any personal involvement in the denials of his request for surgery.  Further, Defendant Wang has presented evidence the he was chief medical officer from January 31, 2013 through January 30, 2015 and did not provide any direct patient care to inmates during this period of time.  (U.F. 5.)  He did not approve or deny any of the RFS at issue here.  (U.F. 31.)  Dr. Beregovskaya had been designated as the person who approved or denied requests for neurological consultation at CSP-COR.  (U.F. 60.)

Dr. Wang did deny Plaintiff's appeal of the denial of the referral to a neurologist on June 18, 2013 at the second level of appeal.  (ECF No. 84-13 at 13-14.)  Plaintiff was seeking a referral for an MRI, but it was found that he had not previously requested an MRI but a referral to the neurologist.  (Id. at 13.)  At the time, Plaintiff did not meet the criteria for an MRI and clinical management was recommended.  (Id.)  Plaintiff also had stated that Dr. Clark had written a referral for an EMG.  (Id. at 14.)  However, this was not true.  (Id.)  Dr. Clark noted that he did write an RFS but did not state what it was for.  (Id.)  He then determined that the RFS would be denied because Plaintiff did not meet the InterQual criteria because his thyroid levels were off.  (Id.)  The RFS was not completed because Dr. Clark had spoken with Defendant Ulit who said that they were working to get Plaintiff's thyroid levels within normal limits.  (Id.)  The test that Dr. Clark wanted to have done could not be done until Plaintiff's thyroid levels were within normal limits.  (Id.)  Defendant Ulit had ordered blood tests for this reason and was adjusting Plaintiff's medication.  (Id.)  Once the thyroid levels were normal, further testing would be able to be completed.  (Id.)  As discussed above, Plaintiff has failed to demonstrate that any defendant was deliberately indifferent by denying his request for an orthopedic consult prior to his thyroid issues getting resolved.  Plaintiff has failed to meet his burden to show that a genuine issue of material fact exists that Defendant Wang acted with deliberate indifference toward Plaintiff's serious medical needs while he was the chief medical officer.

### c.   Defendant Wang's treatment of Plaintiff

Defendant Wang first saw Plaintiff as his PCP on May 14, 2015.  (U.F. 141, 5/14/15 Medication Reconciliation, ECF No. 84-7 at 131.)  At that visit, Plaintiff complained of

1  numbness in his right hand and wanted to change his medication from gabapentin and ibuprofen

2  to an NSAID.  (Id.)  Defendant Wang changed Plaintiff's medication to Naproxen.  (U.F. 142.)

3  None of the later visits with Defendant Wang addressed Plaintiff's right hand, wrist or arm pain.

4  (Wang Decl. ¶¶ 22, 23, 24.)  While Plaintiff alleges that Defendant Wang denied an RFS in

5  2016, Defendant Wang was not at CSP-COR for any part of 2016.  (U.F 143.)  His last day as a

6  physician & surgeon at CSP-COR was December 31, 2015.  (Wang Decl. ¶ 25.)

7        Plaintiff has not met his burden to demonstrate that a genuine issue of material fact exists

8  as to Defendant Wang.  The Court recommends that Defendant Wang's motion for summary

9  judgment be granted.

**VI.**

10

**CONCLUSION AND RECOMMENDATION**

11

12        Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' motion for

13  summary judgment be GRANTED in its entirety.

14        This findings and recommendations is submitted to the district judge assigned to this

15  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within thirty (30)

16  days of service of this recommendation, any party may file written objections to this findings and

17  recommendations with the court and serve a copy on all parties.  Such a document should be

18  captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district

19  judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. §

20  636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

21  result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014)

22  (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

23

24  IT IS SO ORDERED.

25  Dated:   **April 17, 2020**

          _UNITED STATES MAGISTRATE JUDGE_

26

27

28